

**SAM P. ISRAEL**
FOUNDER & MANAGING PARTNER

Eleonora Zlotnikova
Timothy Foster
Timothy Savitsky
David Hrovat
*Associates*

**BY ECF**
Hon. James L. Cott
United States Magistrate Judge
United States District Court
Southern District of New York
500 Pearl Street, Room 21-D
New York, NY 10007-1312

October 17, 2018

Re: <u>*King v. Wang et. al.* **No. 14-cv-07694 (JFK-JCL)**</u>

Dear Judge Cott:

      We write as counsel for Plaintiff Yien-Koo King ("Plaintiff") in response to the letter from Mr. Akiva Cohen, Esq. dated October 15, 2018 which seeks a pre-motion conference regarding the issuance of subpoenas sent to six attorneys who were involved in the defendants' asset transfers between 2004 and 2016. Initially, we note that the Mr. Cohen's assertion that we were unwilling to meet and confer is false. Substantively, as explained below, the defendants Andrew and Shou-Kung Wang's (the "Defendants") protestations are made for the sole purpose of keeping their multi-million-dollar RICO operations secret. Notwithstanding the objections in Mr. Cohen's letter, the Plaintiff does not seek privileged communications from anyone except the attorney who, together with Andrew, orchestrated the suspect contracts with the five strawmen buyers (*i.e.*, Martin Klein, Esq.) referenced in our letter to Your Honor of October 10, 2018. *See* Dkt. No. 101. Because he was <u>demonstrably</u> directly responsible for arranging the strawman sales between 2005 and 2009, Mr. Klein is one of the most important witnesses in this case—he must produce documents and he must be deposed.

      As earlier noted, this case concerns an estate fiduciary who violated federal and state law by selling millions of dollars' worth of estate-owned paintings to himself and his father through six fraudulent contracts, only to then advertise and resell those paintings in China to reap tens of millions of dollars in profits. There are two periods of financial activity under scrutiny: <u>2003-2009</u>, when the Defendants used their own funds to clandestinely purchase $4.3 million in art from the estate of Chi-Chuan Wang (the "Estate"), and <u>2008-2016</u>, when the works were re-sold for a fortune overseas. The six subpoenas at issue (*i.e.* five to real-estate attorneys and one to Mr. Klein) seek information on accounts used to accomplish both ends of these fraudulent transactions. The objective is to obtain records reflecting the specifics of the Defendants' funding of their strawman scheme and how/when they profited from it. The subpoena to Mr. Klein additionally seeks information related to his involvement in the organization and execution of the six strawman sales. As set forth below, the Plaintiff is equipped to make a prima facie showing of the witness's role in this regard.

### The Subpoenas to the Real Estate Attorneys Do Not Seek Privileged Communications; They Seek Documentation Relevant to the RICO Enterprise

The Defendants' finances are relevant to the question of how they managed to purchase $4.3 million dollars' worth of Estate paintings between 2005 and 2009 and purchase $13 million dollars' worth of real property between 2009 and 2016.  As of 2018, property records and Chinese news reports indicate that the Defendants are millionaires many times over, yet this was not always the case. Andrew Wang testified during a deposition in 2005 that in the late 1990s and early 2000s he struggled to make ends meet. In 1997 he tried operating a modern-art studio out of a Manhattan condo his grandfather gave him, but he and his business partner "spent all the money [they made] on the maintenance of the place." Andrew eventually closed his art-studio venture and was forced to move in with Shou-Kung (his father) in Queens while taking an entry-level job at Sotheby's. Andrew previously testified that in 1999 he left Sotheby's and "was earning some little money" from renting out his condo, "but not enough for myself." He claims to have earned a modest sum from consulting at a Chinese auction house in 2002 and made a significant amount of money ($350,000.00) from selling his condo in 2003. Beyond this, Andrew Wang admitted to owning scant assets. Defendant Shou-Kung testified to similar financial circumstances. Though his art company, defendant Jian Bao Gallery, had a modest collection of paintings, Shou-Kung claimed these were all stolen by his sister (*i.e.* the Plaintiff) and her husband in or about 1998 and have remained in "their hands" ever since. In terms of income, Shou-Kung testified his only source was a salary of "$1,000 a month" from his father (*i.e.* decedent Chi-Chuan Wang) which continued "until Kenneth King and Yien Koo got rid of [him]" in 1998.

The subpoenas served on the five real-estate attorneys seek documents related to the accounts used by Shou-Kung and Andrew between 2003 and 2016 to buy and sell a total of $17 million worth of real estate. Such information is probative for at least two reasons. First, if non-privileged production from the attorneys identifies bank accounts that were used for large transfers with the strawmen buyers and/or overseas accounts which paid the Estate for the 98 paintings at issue, then this would be conclusive evidence of self-dealing. Separately, if the real-estate attorneys' records show (as we believe they will) that Andrew and Shou-Kung were involved in other large-scale asset transfers or controlled multi-million-dollar accounts this would be indicative of their profiting from the RICO enterprise. Evidence of a defendant's sudden increase in wealth following an alleged large-scale property crime is probative of whether the defendant participated in the crime. *See, e.g.*, *United States v. Ewings*, 936 F.2d 903 (7th Cir. 1991); *United States v. Trudo*, 449 F.2d 649, 651 (2d Cir. 1971).

Again, the subpoenas to the five real-estate attorneys do not target privileged communications, though we would expect privilege logs to be created as required by the S.D.N.Y. Local Rules and Fed. R. Civ. P. Rule 45.

### The Subpoena Served on Martin Klein, Esq. Seeks Both Non-Privileged Documentation and Potentially Privileged Communications Based Upon the Crime-Fraud Exception

The issue of attorney-client privilege raised in Mr. Cohen's letter is relevant only to the subpoena served on Martin Klien, Esq. of Kamerman, Uncyk, Soniker, and Klien, P.C. (the "Kamerman Firm"). By way of background, a jury verdict rendered in 2017 found that the will (the "Fraudulent Will") propounded by the Defendants (and which first prompted Andrew's appointment as preliminary executor) was fraudulent, coerced, and signed at a time when C.C.

2

Wang lacked testamentary capacity. By way of further background, the Kamerman Firm was the entity which drafted the Fraudulent Will and oversaw its execution in February 2003.[1] Following Andrew's appointment as preliminary executor in August 2003 pursuant to the Fraudulent Will's terms, Mr. Klein of the Kamerman Firm began representing Andrew in his fiduciary capacity and proved instrumental in effectuating the sales at issue. Mr. Klein received communications from Andrew about each of the buyers' supposed offers and then made sales pitches to the Public Administrator (Andrew's co-fiduciary) to get her approval for the alleged arm's length deals.

To the extent that communications exist between Andrew and Mr. Klein which may be categorized as privileged, they are discoverable under the crime-fraud exception which "strips the privilege" as to communications which were made "in furtherance of contemplated or ongoing criminal or fraudulent conduct." *John Doe, Inc. v. United States (in re John Does, Inc.)*, 13 F.3d 633, 636 (2d Cir. 1994) (internal quotation omitted). The exception has two requirements: (1) there must be at least a "reasonable basis to suspect" that a fraud or crime was attempted by the party invoking privilege and (2) the communications with counsel must have been in furtherance of that crime (even if counsel was unaware). *Ivers v. Keene Corp. (In re Bairnco Corp. Sec. Litig.)*, 148 F.R.D. 91, 100 (S.D.N.Y. 1993) (citations omitted). Both prongs are met here.

First, there is a reasonable basis to suspect "the client was engaged in planning a fraudulent scheme when seeking advice from counsel." *Id.* Beyond mere "suspicion," it is an incontrovertible fact that Andrew lied when securing the Public Administrator's approval for his sales by hiding the true identities of the buyers. As mentioned in our prior letter, the purported buyer of $400,000.00 worth of paintings, Wei Zheng, testified through a translator in 2015 that: (a) he never purchased a dime's worth of classical Chinese art in his life, (b) could not read or understand the English contracts Andrew asked him to sign, (c) could never have afforded to pay for the paintings he agreed to purchase, and (d) had no involvement in the transaction other than signing the documents which listed him as the buyer. None of this was divulged to the Public Administrator at the time. In another instance, when confronted with the fact that one of the purchaser's residential address was Andrew's own home in China, Andrew dissembled by claiming that the purchaser was *a friend* who was living with him at time. Altering his story yet again, he recently claimed in sworn discovery responses that he cannot provide complete information on the five strawmen buyers because he did not deal with them directly.[2] His interrogatory responses claim the middle-man who "had the direct contact" with the five strawman buyers is dead and the information sought by the Plaintiff gone. As shown below, however, the existence of a middle-man between Andrew and the strawmen is squarely refuted by Mr. Klein's communications with the Public Administrator.

The second prong is satisfied because Marty Klein, Esq. played an indispensable role in advancing the Defendants' fraud. For instance, Mr. Klein forwarded the following message to the Public Administrator's counsel (Peter Schram, Esq.) on January 27, 2005 to induce her approval of the first Estate sale to "Mr. Zheng":

---

[1] The jury's finding was upheld in its entirety on appeal to the Appellate Division: First Department in 2018. Leave to appeal was subsequently denied by the New York Court of Appeals.

[2] We will have a transcript of the testimony and discovery responses available at the scheduled conference on October 23, 2018.

| To: Peter Schram | Telefax No.: 212-896-3316 |
|---|---|
| From: Martin Klein | Date: January 11, 2005<br>January 27, 2005<br>Page 1 of 2 pages |

This information should remain **confidential** and not be disclosed to any other party.

Attached is a list of art that Andrew has received offers to purchase from a Mr. Zheng. The OTE number is the Crozier storage number. Andrew was able to receive offers that are at least 20% more than the Sotheby's appraisal for all except item number 4. Andrew believes that Mr. Zheng would go forward with the sale even if it does not include item number 4.

Some of the painting that Mr. Zheng has offered to purchase are the same that Mrs. Qu has offered to purchase, however, an issue has arisen with respect to the collection of sales tax and Andrew is still waiting for a reply from Mrs. Qu. He has notified both purchasers that sales will be completed on a first come first served basis.

Please review the terms of this proposed sale with the Public Administrator and let us know as soon as possible whether Andrew may proceed with this sale.

Thank you.

Mr. Zheng, according to both his and Andrew's sworn testimonies, never offered to—and did not— purchase *any* paintings. All of the escrow agreements, bills of sale, sales contracts, and other documents signed by Wei Zheng in February 2005 and forwarded to the Estate by Mr. Klein were shams. This is fraud.[3]

Even if Mr. Zheng's sworn disavowal did not exist, other evidence proves that the 98 paintings sold to the five buyers found their way back into Andrew's hands in China. Andrew displayed a total of approximately 25 Estate-sold paintings (which included at least one painting from each of the five strawmen buyers) at major Chinese art exhibitions in 2009 and 2010. He wrote exhibition prefaces, gave speeches, and spoke to reporters about how he took great pride in bringing Chi-Chuan Wang's artwork back to the "Motherland." As one article published by China.com explained:

> **Yesterday, Mr. Yiqiang Wang [Andrew Wang], the grandson of the late great collector Mr. Jiqian Wang [C.C. Wang], came to the Capital Museum and stood in front of this national treasure [*Guo Xi*'s "Travelers in Autumn Mountains"], an ancient painting of the Song Dynasty. He called this a "homecoming" tour of the cultural relics.**
>
> **\* \* \* \***
>
> **Yiqiang Wang [Andrew Wang] said that this exhibition was just the beginning of showcasing the collections of the Wang family, and they were considering donating important private collections to the country.**

---

[3] Introductory communications which forward buyer information exist for each of the six sales.

4

The 2009 Capital Museum exhibition referenced in the above article displayed no less than sixteen (16) paintings supposedly sold by Andrew to "Wei Zheng," "Chen Mei Lin," and the rest of the strawmen. And yet it was Andrew who participated in the ribbon cutting ceremony and took credit for supplying the paintings:




*Pictures from the Capital Museum's official website depicting Andrew Wang at the opening ceremony of Hanhai Auction Co. Ltd. and Bao Wu Tang's promotional exhibition in 2009.*

      For the forgoing reasons the subpoenas issued to the five real estate attorneys and Mr. Klein are appropriate and necessary under the Fed. R. of Civ. P. and the Local Rules of this District Court. We thank Your Honor for the Court's attention to this matter and look forward to discussing it more completely at the scheduled pre-motion conference on October 23, 2018.

                            Respectfully submitted:

                            Sam P. Israel, P. C.

                            **By:**    */s/Sam P. Israel*
                            Sam P. Israel (SPI0270)
                            Attorneys for Plaintiffs
                            180 Maiden Lane, 6th Floor
                            New York, New York 10038
                            T: 646-787-9880 | F: 646-787-9886

cc.     Carolyn Shields, Esq. (*via* ECF);
        Akiva Cohen, Esq. (*via* ECF)

Enclosures