**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |
|---|---|
| Andrew Wang; and Shou-Kung Wang, individually and derivatively on behalf of the Chi-Chuan Wang Revocable Trust, | ) ) ) ) Case No.:  1:18-cv-8948 |
| Plaintiffs, | ) **FIRST AMENDED COMPLAINT** |
| v. | ) (JURY TRIAL DEMANDED) |
| Yien-Koo King; Kenneth King; Raymond King; Lynn King; Joseph Shih-Fan King; and Does 1 through 10, | ) ) ) ) ) |
| Defendants. | ) |

_____

Plaintiffs Andrew Wang ("Andrew") and Shou-Kung Wang ("S.K."), individually and

derivatively on behalf of the Estate of Chi-Chuan ("C.C.") Wang and the C.C. Wang Revocable

Trust (collectively, "Plaintiffs"), by and through their undersigned attorneys, for their First

Amended Complaint against defendants Yien-Koo King Wang ("Y.K."), Kenneth King

("K.K."), Raymond King ("R.K.") and Does 1 through 10 (collectively, the "Kings" or

"Defendants")[1], upon knowledge as to themselves and upon information and belief as to all other

matters, allege as follows:

**PRELIMINARY STATEMENT**

1.      This action arises from the Kings' fraudulent, decades-long scheme to rob their

extended family of the bounty of the estate of Wang family patriarch and world-renowned art

collector, teacher, and artist C.C. Wang (the "Estate"), including his extraordinary collection of

---

[1] With this Amended Complaint, Plaintiffs have dropped previously named defendants Lynn King and Joseph Shih-Fan King and have brought claims by Shou-Kung Wang derivatively on behalf of the Estate of Chi-Chuan Wang. Plaintiffs will seek an order from the Court to amend the current caption to reflect the current parties.

priceless works of classical Chinese art.  The scheme -- devised and perpetrated by Defendants

Y.K. (C.C. Wang's daughter and S.K.'s sister) and her husband K.K., aided by their son R.K. --

deprived Wang family members of their rightful inheritance by, among other things, converting

artworks belonging to the Estate for Defendants' personal gain, stealing artworks belonging to

S.K. (C.C.'s son), asserting false allegations and submitting forged documents in the Surrogate's

Court of the State of New York (the "Surrogate's Court") to remove Andrew (C.C.'s grandson

and S.K.'s son) from his position as Preliminary Executor of the Estate, filing a sham bankruptcy

in the United States Bankruptcy Court, and advancing false allegations in support of meritless

claims against Andrew and S.K in this court.

2.       As set forth in detail herein, Defendants' scheme began prior to C.C.'s death and

continues to this day.  Prior to C.C.'s death, Defendants schemed to alienate S.K. from C.C., to

take control of C.C.'s assets, and to loot those assets through, among other things, a series of

fraudulent transfers and self-dealing transactions involving a byzantine network of offshore shell

companies and bearer-share entities controlled by Defendants.  In addition to their financial

manipulations, Y.K. and K.K. physically looted C.C.'s art collection and illegally secreted

dozens of classical Chinese and other artworks belonging to the Estate out of the United States to

locations across Asia.  Defendants also stole artwork owned by S.K., Andrew, and other

members of the Wang family, including C.C.'s Taiwanese cousin Hui Chen Wang Chang ("Hui

Chen"), that was stored with C.C.'s art collection.

3.       Upon C.C.'s death in 2003, Defendants' scheme continued in the Surrogate's

Court.  In that court, Defendants advanced fraudulent claims that they were personally gifted tens

of millions of dollars' worth of C.C.'s artwork.  Defendants also converted tens of millions of

dollars' worth of Estate-owned artwork via private sales in China.  These sales were made in

violation of a restraining order (the "Restraining Order") issued by the Surrogate's Court that unequivocally barred Defendants from selling any property or assets of the Estate, or property claimed to belong to the Estate.  The scale of these transactions was massive:  six of the restrained paintings sold for a combined total of over $30 million at public auctions in China.

4.     In furtherance of their scheme, Defendants also engaged in systematic fraud on the Surrogate's Court to defeat probate of C.C.'s last will -- a will that disinherited Y.K. -- and to remove Andrew as Preliminary Executor of the Estate.  To that end, Defendants submitted false and perjured testimony and forged documents to the Surrogate's Court, including forged "settlement" documents prepared by or at the direction of Defendants.

5.     Defendants' scheme has continued in this Court.  In furtherance of the scheme, Defendant Y.K. filed pleadings against Andrew and S.K. that contained misrepresentations of key allegations bearing on the timeliness of Y.K.'s claims.  In her complaint against Andrew and S.K., Y.K. alleged she discovered the purported "straw men" sales by Andrew in the "fall of 2013," when she learned of the 2009 Bao Wu Tang Exhibition at the Capital Museum in Beijing at which certain Estate paintings were displayed.  These allegations are expressly contradicted by an affidavit submitted by Y.K. in the Surrogate's Court in May 2010.  In that affidavit, Y.K. swore that she "became aware" of the "highly publicized" Bao Wu Tang Exhibition "in early November 2009" (not 2013, as alleged in her complaint against Andrew and S.K.) when she obtained "a catalog of the Exhibition, produced by the Beijing Capital Museum, which included images and descriptions of the artwork displayed in the Exhibition."  Thus, Y.K.'s allegation that she discovered the "straw men sales" in 2013, are contradicted by her sworn statements from 2010, which establish that she was aware of the Bao Wu Tang Exhibition in 2009 -- a date that renders many, if not all, of Y.K.'s claims against Andrew and S.K. time-barred.

6.      Plaintiffs bring this action to recover the tens of millions of dollars in damages suffered by the Estate as a result of Defendants' scheme, which involved fraud, breaches of fiduciary duty, conversion, and other misconduct.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction pursuant to 18 U.S.C. § 1964(c) over the claims arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962; pursuant to 28 U.S.C. § 1331 over the claims arising under federal law; and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the state law claims.

8.      Venue in this district is proper pursuant to 28 U.S.C. § 1391 because this is the judicial district in which a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred.

## PARTIES

9.      Plaintiff Andrew Wang is the grandson of C.C. and the son of S.K.  Andrew is a citizen of the State of New York, a 10% beneficiary of the Estate pursuant to a February 10, 2003 Codicil (the "2003 Codicil") to C.C. Wang's June 13, 2000 will (the "2000 Will"), and 10% beneficiary to the Estate pursuant to C.C. Wang's February 18, 2003 will (the "2003 Will").

10.      Plaintiff Shou-Kung Wang is the son of C.C., the brother of Y.K., and the father of Andrew.  S.K. is a citizen of the State of New York.  S.K. is a 35% beneficiary of the Estate pursuant to the 2000 Will, a 40% beneficiary of the Estate pursuant the 2003 Codicil, and a 40% beneficiary of the Estate pursuant to the 2003 Will.  S.K. is also a Trustee of the C.C. Wang Revocable Trust, dated February 21, 1997 as amended in 1998 and 2000 (the "Trust") and a 40% beneficiary of the Trust.[2]  S.K. brings these claims on behalf of the Estate, as a beneficiary

---

[2] C.C. revoked the Trust on his deathbed.  Y.K., however, has challenged that revocation, and, to the extent that the

thereof.  S.K. has made no demand on the Estate to bring these claims against Defendants as any such demand would be futile.

11.     Defendant Y.K. is the daughter of C.C., the sister of S.K., the husband of K.K., and the mother of R.K.  Y.K. is the current Preliminary Executrix of the Estate pursuant to the 2000 Will.  Y.K. is a citizen of the United States, and she is domiciled in Shanghai, People's Republic of China.  She also at times resides at 190 East 72nd Street, Apt. 2C, New York, NY 10021.

12.     Defendant K.K. is the husband of Y.K. and the father of R.K.  K.K. is a citizen of the United States and is domiciled in Shanghai, People's Republic of China.  He also at times resides at 190 East 72nd Street, Apt. 2C, New York, NY 10021.

13.     Defendant R.K. is the son of Y.K. and K.K. and the grandson of C.C.  R.K. is a citizen of the State of Oregon and is domiciled at 27705 SW Heater Road, Sherwood, Oregon 97140.

14.     The identities of the defendants sued as Does 1 through 10 and the facts constituting the causes of action against these defendants are at present unknown to Plaintiffs. The defendants sued under fictitious names are responsible in some manner for some or all of the claims alleged herein.[3]

---

Trust was not validly revoked, S.K. is a present beneficiary of the Trust, to which C.C. had assigned all interest in his collections of art, paintings, antiques and collectibles.

[3]  When Plaintiffs learn through discovery the identities of these fictitiously named defendants and the facts constituting the causes of action against them, Plaintiffs will seek leave of court to amend their complaint.

## FACTUAL ALLEGATIONS

**I.    Defendants' Theft of C.C. Wang's Art Collection and Other Assets**

**a.    Y.K. Obtains Control Over C.C.'s Assets**

15.    Between 1979, when he immigrated to the U.S. from China, and 1997, S.K. assisted C.C. in managing his business affairs.  Y.K. objected to S.K. serving in this role and disparaged S.K. to her father, falsely accusing S.K. of mismanaging C.C.'s affairs.  In 1997, under the influence of Y.K.'s false allegations against S.K., C.C. relieved S.K. of his role as C.C.'s primary assistant and manager of his finances, and Y.K. assumed the role.

16.    When Y.K. assumed management responsibility over C.C.'s finances in 1997, C.C. had over $7 million in liquid assets held in a number of bank and brokerage accounts and had amassed substantial real estate holdings.  C.C. also possessed a world-class collection of ancient Chinese art (the "Classical Collection").  The Classical Collection included both artworks that C.C. owned (individually or through a corporate entity) as well as artworks that C.C. had custody over and managed on behalf of relatives including S.K. and C.C.'s cousin, Hui Chen.

**b.    Y.K. and K.K. Divert C.C.'s Assets To Themselves**

17.    During the period in which Y.K. managed his business affairs, C.C. afforded Y.K. significant access to his financial accounts, art holdings, and other assets.  Y.K. took advantage of the access and control afforded to her by her father to appropriate C.C.'s assets to herself and K.K.  Upon, or shortly after, taking over management of C.C.'s finances and affairs, Y.K. and K.K. devised and executed a scheme to appropriate the Classical Collection and C.C.'s other assets for themselves.

18.    In 1997, title to C.C.'s assets was held either by C.C. individually, in a company called Eastpal Trading, Ltd. ("Eastpal") (a company in which Andrew and S.K. were also

shareholders), in a company called Northwich Investments, Ltd. ("Northwich"), or in other corporate entities controlled by C.C. In or around 1997, C.C. formed Northwich, a bearer-share corporation, to hold certain assets. C.C. gave the share certificate to Y.K. for safekeeping in connection with her duties managing his affairs.

19.     After Y.K. took over management of C.C.'s assets, Y.K., K.K., and another partner formed a series of corporate entities into -- and through -- which C.C.'s assets were looted: Tie Fung International, Ltd. ("Tie Fung"), Soon Huat, Inc. ("Soon Huat"), and Goldwave Trading, Ltd. ("Goldwave" together with Tie Fung, and Soon Huat, the "King Entities").

20.     Y.K., acting alone or in concert with K.K., orchestrated a series of fraudulent transactions in which the bulk of C.C.'s assets were transferred to the King Entities. For example, Y.K. transferred $1,913,300 directly from C.C.'s Citibank account to Tie Fung, an entity in which C.C. had no interest. Subsequently, Tie Fung transferred $1,080,000 to Soon Huat and $650,000 to Northwich. Tie Fung also distributed $40,000 to an entity known as "Bentwick" and $60,000 to an entity known as "Kemal," additional corporations controlled by Defendants, and $7,000 to K.K. directly.

21.     Later, Y.K. transferred roughly $4,216,000, plus an additional HK$546,242 from C.C.'s accounts to a Northwich account. Northwich then transferred $3,570,000 to Goldwave, which later sent $2,730,000 back to Northwich. Northwich also transferred $460,000 to Soon Huat. In addition, Northwich transferred an additional (a) $360,000 to Bentwick and Kemal, (b) $250,000 to Translink Investment Ltd., (b) $305,000 to Excal International Development Corporation, and (d) $313,250 to Luxin Real Estate, additional corporations that are, on information and belief, owned and controlled by the Defendants. Northwich also sent $36,000 directly to K.K. Finally, Northwich and Tie Fung distributed a total of $182,000, plus

HK$300,000, to another individual, H.H. Fang ("Fang"), who acted as a corporate director for the King Entities, and who had served as an informal financial advisor to C.C.

22.     Defendants proceeded to use the monies transferred to the companies they controlled to "purchase" art from C.C.  In a series of seven transactions entered into between March 31, 1998 and September 6, 2000, Y.K. and K.K. effected transactions by which Northwich and Soon Huat used $1,262,995 of the cash obtained from C.C. to "purchase" forty-five pieces of classical Chinese art from C.C. and Eastpal.

23.     Defendants have acknowledged that the art "purchased" by Northwich and Soon Huat -- both of which were under Defendants' control -- for less than $2,000,000 has a fair market value in the tens of millions of dollars.

24.     At least some of the transfers described above were accomplished via interstate wire transfers, telephone calls, and mailings.  Y.K. and K.K.'s communications with R.K. in furtherance of the scheme were via interstate phone call, internet email, and interstate mail.

     **c.      Y.K. Manipulates C.C. to Sign a Will Providing Her an Excess Portion of His Estate**

25.     In furtherance of their scheme to aggrandize themselves at the expense of their relatives, Defendants improperly manipulated C.C. to execute a will that provided Y.K. an outsize portion of the Estate relative to her siblings.  From the early 1980's through his death, C.C. executed approximately eight separate wills.  In June 2000, during the period in which Y.K. managed C.C.'s affairs, Y.K. convinced C.C. to execute the 2000 Will, the second-to-last will of his life.

26.     The 2000 Will provided Y.K. a share of the Estate that far exceeded the shares provided for C.C.'s other children.  Under its terms, prior to any distributions being made to any of C.C.'s children, Y.K. was to receive a special distribution -- described as an "Equalization

Payment" -- from the Estate equal to the value of the four apartments owned by C.C. located at 150 East 69th Street, New York, NY.  This arrangement was a significant departure from the testamentary scheme C.C. had employed in his prior wills, each of which provided for a more equitable distribution of his assets among his children.

       **d.**       **Defendants' Theft of Classical Collection Artworks**

       27.      Prior to the time in 1997 when Y.K. took over management of C.C.'s affairs, the majority of the art that comprised the Classical Collection was stored in a safe deposit box in a bank branch located in C.C.'s apartment building at 150 East 69th Street, New York, NY (the "Northfork Box").  During these years, C.C. had personal access to the Northfork Box, and was able to, and often did, access the artworks in the Northfork Box to view, study, and display.

       28.      Upon taking control of C.C.'s affairs, and through January 2003, Y.K. moved the majority of the artworks comprising the Classical Collection from the Northfork Box to storage spaces at Day & Meyer Murray & Young Corp. ("Day & Meyer"), a facility that specializes in the storage of fine art.  Y.K. did not have C.C.'s permission to move his artworks to Day & Meyer, and Y.K. did not inform C.C. that she had done so.  Moreover, contrary to the arrangement at Northfork Bank, Y.K. did not provide C.C. any right of access to the storage spaces at Day & Meyer where the bulk of the Classical Collection was stored.  Instead, Defendants alone are believed to possess authority to access the artworks.  There was no legitimate reason for Y.K. to have barred C.C. from access to the artworks in the Classical Collection.

       **e.**       **Defendants' Theft of C.C.'s Northwich Bearer Shares**

       29.      In or about the fall of 2002, C.C. began asking Y.K. questions about the state and location of his assets, including artworks from the Classical Collection.  At this time, C.C. wanted to view artworks from his collection, but Y.K. refused to provide him access.  Growing

suspicious of Y.K., C.C. asked her to provide him with the bearer-share certificate for his shares in Northwich.

30.     Y.K., however, refused to produce the Northwich share certificate to C.C. Instead, Y.K. fled the United States for Asia, taking the Northwich share certificate with her.

31.     Y.K. purchased her tickets to Asia for this trip utilizing interstate telephone calls, internet purchases, or interstate mailings.

32.     While in Asia, Defendants conspired with Fang to transfer ownership of Northwich from C.C. to Y.K.  At Defendants' direction and in furtherance of the scheme, Fang canceled the Northwich bearer-shares and issued standard share certificate in Northwich in his own name.  C.C. received no consideration for the transfer of ownership of Northwich to Fang. Moreover, C.C. did not participate in, was not aware of, and did not approve of the cancellation of his shares in Northwich and the re-issuance of the shares to Fang.

33.     C.C. passed away months later, in July 2003.  Subsequent to C.C.'s death, Defendants, in furtherance of the scheme, directed Fang to cancel the Northwich share certificate that were issued in Fang's name and to re-issue standard share certificates in Y.K.'s name.  The effect of this manipulation of the Northwich bearer-share certificate was to transfer, illegally and without the knowledge of C.C. or his other heirs, the assets of Northwich to Y.K. personally. Defendants "transaction" of C.C.'s bearer-share certificate in Northwich to Fang, and then to Y.K., had no economic purpose, was made without consideration, and was made solely to advance Defendants' scheme to loot the Estate.

II.     **C.C. Disinherits Y.K. Pursuant to the February 2003 Codicil and the February 2003 Will**

34.     In late 2002, after Y.K.'s departure to Asia and C.C.'s discovery of her misconduct in managing his affairs, C.C. asked S.K. to take over management of his financial affairs.

35.     In further response to Y.K.'s defalcations, C.C. modified the 2000 Will to disinherit Y.K.  To that end, on February 10, 2003, C.C.'s long-time friend and attorney, Joe Erlichster, supervised the execution of a codicil to the 2000 Will.  The codicil re-instated the testamentary scheme C.C. had employed in his wills prior to the 2000 Will, but disinherited Y.K., allocated her share of the Estate to two of S.K.'s children:  Andrew and Stephen Wang.

36.     On the advice of Mr. Erlichster, C.C. proceeded to have a new will drafted -- ultimately the 2003 Will -- to replace the 2000 Will and the 2003 Codicil.  On February 18, 2003, another of C.C.'s long-time attorneys, Jerome Kamerman of Kamerman Soniker, P.C., supervised the execution of the 2003 Will, provided the same distributive scheme that was provided in the 2003 Codicil and named Andrew as executor of the Estate.

37.     At the signing ceremony for the 2003 Will, C.C. read a statement explaining that he was disinheriting Y.K. on the ground that, *inter alia*, her misconduct described above including her mismanagement of his art and assets, her refusal to turn over artwork from the Classical Collection to him, and the actions of her husband, K.K., in physically taking a valuable painting from C.C.'s hands over his protests.

III.    **The Surrogate's Court Proceedings**

38.     C.C. passed away in July 2003 at the age of 97.  Upon his death, Andrew and S.K. submitted the 2003 Will to the Surrogate's Court for probate, and the will was promptly

challenged by Y.K.  Pursuant to the terms of the 2003 Will and letters testamentary issued by the Surrogate's Court, Andrew was appointed Preliminary Executor of the Estate.

39.     Andrew served as the Preliminary Executor of the Estate from 2003 to 2017. Throughout this period, given Y.K.'s challenge to probate of the 2003 Will and other Estate disputes, the Estate was co-administered, pursuant to order of the Surrogate's Court, by the New York State Office of the Public Administrator.  Early on in the Surrogate's Court proceedings, attorneys for the Public Administrator endeavored to create an inventory of all artworks in the Estate for tax purposes.  That inventory was put together by an attorney for the Public Administrator named Alan Appel and became known as the "Appel Inventory," a copy of which is attached hereto asExhibit A.

40.     The Appel Inventory is, essentially, a list of all artworks believed to be property of the Estate, including all artworks about which there is a dispute as to ownership.  The Appel Inventory lists hundreds of artworks and identifies, among other things, who was in possession of the artwork at the time the list was compiled, (if known), and the beneficiaries' respective positions as to whether the artwork is property of the Estate or not.

41.     In their contributions to the Appel Inventory, Defendants acknowledged that they were in possession of dozens of artworks belonging to the Estate, but which Defendants contended were their personal property or the property of corporations under their control.

42.     From 2003 through 2017, Andrew served as Preliminary Executor of the Estate, and, in this role, managed the affairs of the Estate with, and at the direction of, the Public Administrator.  During the period Andrew served in this role, and before, numerous proceedings were commenced in the Surrogate's Court, including, but not limited to, probate proceedings

regarding the 2003 Will and discovery proceedings intended to address questions regarding the Estate assets.

### a. The Surrogate's Court Restrains the Sale of Estate Assets, Including All Artwork Listed on the Appel Inventory

43.     Upon commencement of the Surrogate's Court proceedings, and in view of the significant dispute over the Estate among its beneficiaries, the Surrogate's Court issued a restraining order (the "Restraining Order") that barred Plaintiffs and Defendants from, among other things, selling any Estate artwork or artwork claimed to be part of the Estate over which a dispute existed.  The Restraining Order provided:

> Pending the hearing and determination of the within petition [by the Public Administrator for a SCPA 2103 discovery proceeding], respondents Andrew Wang, Shou-Kung Wang, Yien-Koo Wang King and Kenneth King, and their respective agents, employees, representatives and assigns are restrained from selling, transferring, encumbering, leasing, assigning, consigning, or otherwise disposing of (i) any property which is property of the Estate; (ii) any property formerly owned by decedent Chi-Chuan Wang a/k/a C.C. Wang (hereafter "Decedent") which any respondent claims was gifted to the respondent or the respondent's agent, employee, representative, assignee or any corporate entity which the respondent may control; (iii) any property formerly owned by Decedent which any respondent claims was sold to the respondent or the respondent's agent, employee, representative assignee or any corporate entity which the respondent may control; and (iv) any property formerly owned by Decedent which any respondent claims was given on consignment to the respondent or the respondent's agent, employee, representative, assignee or any corporate entity which the respondent may control.

44.     The Restraining Order remains in effect and applies to Defendants and Plaintiffs.

### b. Y.K.'s Conversion and Sale of Estate Assets in Violation of the Restraining Order

45.     In furtherance of their scheme, Defendants sold numerous artworks listed on the Appel Inventory that were subject to the Restraining Order in private sales in China.  In furtherance of their scheme, and in blatant violation of the Restraining Order, Defendants sold at

least six paintings collectively worth over $30 million (the "Six Paintings").  The Six Paintings and the sales prices realized at auction are:

    i.    Chen Hong-Shu's *Autumn Beauties,* No. 68 on the Appel Inventory, was sold for $5,208,000.00 at the TienHang auction house in Shanghai on December 22, 2009;

    ii.    Chu Ta's *Landscape as Ni Tsan,* No. 87 on the Appel Inventory, was sold at a Beijing auction on June 26, 2009, for $12,600,000.00;

    iii.    Tao Chi's *Narcissus & Bamboo,* No. 292 on the Appel Inventory, (identified on the inventory as Narcissus, Bamboo) sold for $1,522,500.00 at a Beijing auction on June 4, 2013;

    iv.    Tao Chi's *Wild Blow Bamboo,* No. 293 on the Appel Inventory, (identified on the inventory as *Wind Blow Bamboo*) was sold for $4,312,500.00 at a Beijing auction held on June 4, 2012;

    v.    Wang Mien's *Ink Plum Blossom,* No. 352 on the Appel Inventory, was sold at a Beijing auction held on June 3, 2010 for $8,658,000.00; and

    vi.    Wu Li's *Shao lin Poem,* No. 402 on the Appel Inventory, was sold at a Beijing auction held on June 4, 2012 for $1,811,250.00.

46.    On or about December 8, 2018, Plaintiffs discovered that a seventh artwork from the Appel Inventory -- Hsian Sheng-Mo's album of landscapes -- was to be sold at an auction scheduled for late December 2018 at the BaoRuiYing auction house in Beijing.  That artwork is believed to have sold for $600,000.

47.    While the full extent of the Defendants' sales of restrained art is unknown at present, Defendants have, on information and belief, sold additional artworks in private sales in China.

48.    On information and belief, the funds Defendants derived from their sales of the stolen artwork were funneled through R.K.'s bank accounts.

14

c.    Defendants Employ Fraudulent Evidence to Defeat Probate of the 2003 Will
and to Remove Andrew as Preliminary Executor of the Estate

49.    Upon Andrew and S.K.'s submission of the 2003 Will for probate, Y.K. filed

objections to probate in the Surrogate's Court.  In her objections, and in furtherance of the

scheme, Y.K. contended that the 2003 Will was invalid because, as she argued, C.C. lacked

capacity at the time he executed the 2003 Will, which she alleged was procured through fraud

and undue influence.  Removing Andrew as Preliminary Executor was particularly important to

Defendants because, at the time, Andrew was spearheading the Estate's efforts to recover the

Classical Collection artworks from Defendants for the benefit of the Estate, S.K., and Hui Chen.

50.    In the summer of 2006, Y.K. spoke with Dr. Goldstein via telephone and provided

him with false information regarding C.C.'s condition in 2003 in order to procure a fraudulent

opinion from Dr. Goldstein that she could use to challenge the validity of the 2003 Will.  Dr.

Goldstein relied upon these misrepresentation by Y.K. to support his expert opinion -- submitted

in the probate proceedings regarding the 2003 Will -- that C.C. lacked testamentary capacity to

execute the 2003 Will on February 18, 2003.  In that telephone conversation, Y.K. falsely

informed Dr. Goldstein that, among other things:

      i.    She had observed signs of her father's worsening mental deterioration starting
in early 2002;

     ii.    C.C. would forget what he had just been told, had a very short attention span,
and had difficulty focusing;

    iii.    C.C. was unable to write checks, pay his bills, or do his taxes;

    iv.    C.C. seemed depressed and had insomnia; and

     v.    At times, C.C. would not remember Y.K.'s name and would call her "Dora."

51.    Testifying under oath at depositions conducted in the probate proceeding and/or

the separate proceeding commenced to recover the Estate assets, Y.K. and K.K. gave testimony

15

that directly contradicted the information Dr. Goldstein stated in his expert report that he relied upon in forming his opinion regarding C.C.'s testamentary capacity at the time he executed the 2003 Will.

### d. Defendants' Forged "Settlement" Document

52.     In furtherance of scheme, Defendants enlisted their son R.K. to forge a document that purported to show a transfer of artworks from Defendants to Andrew to settle the dispute between the family members over the Estate.  But no such transfer ever occurred.  Instead, Defendants manipulated a document signed by Andrew to give the appearance of his receipt of certain artworks.

53.     The forged settlement document was created by Defendants in connection with a purported settlement proposal, made by Defendants, pursuant to which the parties would settle their dispute as follows: Defendants would agree to return 46 paintings (belonging to the Estate, S.K., and Hui Chen) to the Estate, and Andrew, on behalf of the Estate, would agree that Defendants could retain certain other paintings already in their possession.

54.     The parties met in Shanghai in May 2005 to, as Andrew believed, finalize the proposed settlement and exchange the artworks subject to the agreement.  At the settlement meeting, K.K. provided to Andrew a document that listed the 46 paintings to be returned by Defendants.  To indicate his agreement to the terms, Andrew marked his initials next to each painting listed and signed the document to indicate his agreement to accept these paintings to settle the parties' dispute.[4]

---

[4] Notably, the list of paintings to be retained included four paintings that Defendants had alleged that Andrew and S.K. had taken from C.C.

55.     Pursuant to the proposed settlement, Defendants agreed to bring the forty-six artworks listed on the settlement document to a hotel room in Shanghai to turn over to Andrew. Defendants, however, only returned 15 of the 46 paintings and disappeared from the hotel before providing the remaining 31 pieces to Andrew.

56.     As a result of Defendants' failure to turn over all 46 of the paintings to Andrew, the dispute was not resolved.  Instead, in furtherance of their scheme to loot the Estate, Defendants doctored the "settlement" document signed by Andrew in an attempt to indicate his receipt of all 46 artworks.  To that end, Defendants printed the additional words "46 Pieces Received by Andrew Wang" under Andrew's signature line on the document, added a signature line for Y.K., and removed additional pages that were part of the original document.

57.     Defendants' fraud in connection with the settlement document is demonstrably evident because the language "46 Pieces Received by Andrew Wang" was printed by a *different* printer than the one that was used to print the list of paintings.  Defendants have since used their forged settlement document to challenge the 2003 Will in the probate proceedings in the Surrogate's Court.

58.     In May 2017, based on, among other things, the false testimony of Dr. Goldstein and the forged settlement document, Defendants succeeded in invalidating the 2003 Will and removing Andrew as Preliminary Executor, after which the Surrogate's Court appointed Y.K. as Preliminary Executrix of the Estate.

**IV.      Defendants' Theft of S.K.'s Personal Assets**

59.     In addition to stealing assets of the Estate, Defendants, in furtherance of their scheme, also stole a number of paintings personally owned by S.K., including:

> i.     A landscape sometimes referred to as *Snow Mountain*, by Fan Kuan, No. 104 on the Appel Inventory;

    ii.    *Tao YuanMing*, by Chen Hongshou;

    iii.   A 24-piece album by Qi Baishi;

    iv.   *Temple of Guardians*, by an anonymous painter, No. 14 on the Appel Inventory;

    v.    *Album of Erotica*, by an anonymous painter, No. 2 on the Appel Inventory;

    vi.   A hanging scroll by Qi Baishi; and

    vii.   A 40-piece album by various artists.

60.    The latter two pieces on the above list were brought by S.K. from China when he immigrated to the United States in 1979.

61.    In their representations in the Appel Inventory, Defendants admitted that they were in possession of the first and sixth paintings listed above and stated that the Chen Hongshou had been sold.

62.    With respect to the remaining paintings listed above, Defendants denied possession of the paintings at the time the Appel Inventory was created and have maintained their denials ever since.

63.    In truth and in fact, however, Defendants attempted to sell the 24-piece Qi Baishi album in a private sale in China, confirming for the first time that they were in possession of the album.

## V.    The Fraudulent Bankruptcy

64.    In 2007, Y.K. and K.K. filed for bankruptcy in the United States District Court for the Southern District of New York.  This bankruptcy, though, was a sham:  in their bankruptcy filings, Y.K. and K.K. failed to disclose the full extent of their art holdings, failed to disclose their possession of the proceeds of illicit sales of restrained art, and failed to disclose their interests in the King Entities.  Y.K. and K.K. also failed to disclose in their bankruptcy filings

assets which, in these proceedings, they contend they own.

65.     For example, in the Appel Inventory, Y.K. admitted that the Kings were in possession of dozens of paintings; however, the Kings failed to disclose many of these paintings on their "Schedule of Assets and Liabilities" that was filed in the Bankruptcy Court.  For instance, the Kings claim in their lawsuit against Andrew and S.K. to possess *Clear Morning Over Lakes and Mountains* by Juran, which Defendants assert is worth $2,500,000, and *Pine Pavilion* by Ni Zan, which Defendants assert is worth $2,000,000.

66.     In 2012, based in part on Y.K.'s and K.K.'s representations regarding the scope of their assets, the bankruptcy court issued an order of discharge to the Kings.  Now, having procured that discharge through fraud, Y.K. and K.K. have attempted to use the order of discharge as a shield against efforts to recover assets stolen by them prior to their bankruptcy.

## VI.     Y.K.'s Fraudulent RICO Action against Andrew and S.K.

67.     Y.K. committed fraud not only upon the Bankruptcy Court, but also upon this Court by filing a RICO action against Plaintiffs that contained false allegations.  In furtherance of Defendants' scheme, Y.K. falsely alleged in her First Amended Complaint (the "FAC") in *King et al. v. Wang et al.*, No. 14-cv-7694 (S.D.N.Y.) that she did not discover the alleged "Straw Men Scheme" until 2013 when she learned that "at least eleven of the 98 paintings sold to several different Straw Men [had] appeared in a three-week museum exhibition . . . commencing in November 2009 entitled *'Bao Wu Tang* – an Important Overseas Chinese Painting and Calligraphy Collection Exhibition" (the "Bao Wu Tang Exhibition") hosted by the Beijing-based Capital Museum."

68.     This allegation, however, is contradicted by a sworn affidavit executed by Y.K.  In the affidavit, dated March 8, 2010, a copy of which is attached hereto as Exhibit B, Y.K. affirmed that she in fact learned of the Bao Wu Tang Exhibition in "the fall of 2013."  In her

2010 affidavit, Y.K. stated that she "became aware" of the "highly publicized" Bao Wu Tang

Exhibition "in early November 2009." (Ex. B at ¶ 8.) She further stated that she traveled to

Beijing in the fall of 2009, where she obtained "a catalog of the Exhibition, produced by the

Beijing Capital Museum, which included images and descriptions of the artwork displayed in the

Exhibition." (*Id.* ¶ 9.) According to Y.K.'s 2010 sworn statement, the exhibition catalog and

press coverage "ma[de] it palpably clear that Mr. Wang organized the Bao Wu Tang art

collection and supplied the [art] for display by the Beijing Capital Museum." (*Id.* ¶ 14.) Further,

the exhibition catalog featured at least one painting Mr. Wang claimed not to have. (*Id.*) By

Y.K.'s own allegations in the FAC, the exhibition catalog provided to her in 2009 -- which,

according to her affidavit, she reviewed closely -- also "includ[ed] the 11 works that were

supposed to have been sold to the Straw Men." (FAC ¶ 121). Plaintiffs were thus clearly on

actual notice of the alleged "straw men" sales in 2009.

69.     Y.K.'s assertion regarding her discovery of the purported "straw men" sales in

"the fall of 2013," is flatly contradicted by her own sworn statement in which she admitted,

among other things, that she was acutely aware of the Bao Wu Tang Exhibition 2009, was

provided a copy of the catalog for the exhibition in 2009, and she understood Andrew to have

provided artwork to the exhibition in 2009.

## FIRST CAUSE OF ACTION
### (Civil RICO Against All Defendants)

70.     Plaintiffs repeat and re-allege the allegations of Paragraphs 1-69 as though fully

stated herein.

71.     The acts described herein violate 18 U.S.C. § 1962(a), (b), and (c), entitling

Plaintiffs to relief under 18 U.S.C. § 1964(c).

20

72.     The RICO Enterprise is comprised of Y.K., K.K., R.K. and Does 1-10, and is an association-in-fact.

73.     The RICO Enterprise conducted its affairs through a pattern of racketeering activity, including but not limited to:

    i.    Violating 18 U.S.C. §§ 2314 and 2315 by transporting the contents of the Classical Collection to Asia in 2003;

    ii.    Violating 18 U.S.C. §§ 2314 and 2315 by selling pieces of the Classical Collection from 2003 through the present;

    iii.    Violating 18 U.S.C. §§ 1341 and 1343 by using the mails and wires to accomplish the transfer of C.C.'s art and assets to newly created bearer-share corporations for purposes of stealing that property;

    iv.    Violating 18 U.S.C. §§ 1341 and 1343 by using the mails and wires in connection with the probate and asset recovery proceedings in the Surrogate's Court, in an attempt to retain the stolen property and gain control of C.C.'s Estate, including but not limited to procuring false testimony from Dr. Goldstein;

    v.    Violating 18 U.S.C. § 1512(c) by altering the Fraudulent Settlement Document, which the RICO Enterprise intends to use as "evidence" in Y.K.'s pending Federal litigation in this district;

    vi.    Repeatedly violating 18 U.S.C. §§ 1952, 1956, and 1957 with respect to the funds stolen from C.C. and the proceeds of the unlawful sales of art stolen from C.C., S.K., and Hui Chen;

    vii.    Violating 18 U.S.C. §1961(1)(D) by committing fraud in connection with the Y.K. and K.K.'s bankruptcy; and

    viii.    Violating 18 U.S.C. §§ 1341 and 1343 by using mails and wires in connection with Y.K.'s action against Andrew and S.K. by making material misrepresentations to this Court regarding Y.K.'s discovery of the "straw men sales."

74.     These predicate acts have occurred over a 20-year period.  However, Plaintiffs only discovered that Defendants sold the Six Paintings, collectively worth over $30 million, in violation of the Restraining Order in the last four years.

75.     The RICO Enterprise is likely to continue to engage in racketeering activity in its efforts to deploy and protect its ill-gotten gains, including but not limited to continuing to transfer and use the proceeds of its unlawful activity in violation of 18 U.S.C. §§ 1952, 1956, and 1957.

76.     The RICO Enterprise also used the proceeds of its racketeering activity to gain control of the Estate by ousting Andrew as Preliminary Executor.

77.     The RICO Enterprise is engaged in, or affects, interstate commerce, in that it has sold and will continue to sell illegally obtained art and other assets belonging to the Estate and/or Plaintiffs in interstate commerce.

78.     Plaintiffs have suffered multiple injuries due to Defendants' pattern of racketeering activity, including but not limited to the loss of art and assets by the Estate, and the harm to Plaintiffs and Andrew as a result of Andrew being wrongfully stripped of his position as Preliminary Executor of the Estate.

79.     In addition, Y.K. has used her new position as Preliminary Executrix to revive and maintain a previously dismissed RICO action against Plaintiffs, causing Plaintiffs significant and ongoing expense in defending against a meritless RICO action premised on knowingly false allegations.

80.     Defendants' false allegations against Plaintiffs in the related RICO action has harmed Plaintiffs' reputations and businesses.

81.     As a result of Defendants' fraudulent acts and misconduct, Plaintiffs are entitled to damages in an amount to be proven at trial, including treble damages and attorneys' fees as authorized by statute.

## SECOND CAUSE OF ACTION
### (Conspiracy to Commit Civil RICO Against All Defendants)

82.     Plaintiffs repeat and re-allege the allegations of Paragraphs 1-81 as though fully set forth herein.

83.     Defendants unlawfully, knowingly and willfully combined, conspired, confederated and agreed, together and with others both named and unnamed in this First Amended Complaint, to violate 18 U.S.C. § 1962(c) as described herein, in violation of 18 U.S.C. § 1962(d).

84.     Defendants knew that they were engaged in a conspiracy to commit the predicate acts alleged herein, they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.  This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

85.     Each Defendant knew about and agreed to facilitate the RICO Enterprise's schemes to injure Plaintiffs.  It was part of the conspiracy that Defendants and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the RICO Enterprise, including the predicate acts of racketeering set forth herein, as well as the active concealment thereafter.

86.     As a direct, proximate and intended result of Defendants' conspiracy, the acts of racketeering activity of the RICO Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and reputation, and deprived of their property.  Defendants actively concealed these activities and injuries from Plaintiffs.

87.     As a result of Defendants' fraudulent acts and misconduct, Plaintiffs are entitled to damages in an amount to be proven at trial, including treble damages and attorneys' fees as authorized by statute.

### THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty Against Y.K.)

88.     Plaintiffs repeat and re-allege the allegations of Paragraphs 1-87 as though fully set forth herein.

89.     As Preliminary Executrix of the Estate, Y.K. owes the Estate and its beneficiaries a fiduciary duty.

90.     Y.K. has breached her fiduciary duties by, among other things, looting assets of the Estate; attempting to protect her ill-gotten gains at the expense of the Estate; and by pursuing meritless litigation against beneficiaries to the Estate based on fraudulent allegations.

91.     Moreover, to the extent that the Trust was not validly revoked, Y.K., as a trustee of the Trust, owed S.K., a beneficiary under the Trust, a fiduciary duty.

92.     Y.K. breached her fiduciary duty through the conduct alleged herein, including, without limitation, her use of Estate funds to pursue meritless litigation against Andrew and S.K., her use of funds obtained through illegal sales of Estate assets, and her ongoing sales of Estate assets for Defendants personal benefit.

93.     By reason of Y.K.'s breaches of fiduciary duty, the Estate has suffered harm by the disposition of assets in which the Estate beneficiaries are entitled to share, and other damages.

94.     In the alternative, the Estate is entitled to disgorgement from Y.K. of the profits she obtained through her breach of fiduciary duties.

## FOURTH CAUSE OF ACTION
### (Conversion Against All Defendants)

95.     Plaintiffs repeat and re-allege the allegations of Paragraphs 1-94 above as though fully set forth herein.

96.     The conduct of Defendants alleged herein constitutes a conversion of Plaintiffs' assets, entitling Plaintiffs to an order that the Defendants return their assets or entry of a judgment against Defendants for the value of the converted assets.

97.     In addition to converting assets of the Estate, Y.K. and the Kings also stole a number of paintings personally owned by S.K.

98.     Defendants' conduct was willful, malicious, and undertaken with conscious disregard for the rights of Plaintiffs, entitling Plaintiffs to an award of punitive damages.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial for all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that a judgment be entered against Defendants, jointly and severally, as follows:

A.     On the First and Second Causes of Action, for three times the amount of Plaintiffs' actual damages, in an amount to be determined at trial, together with Plaintiffs' costs and attorneys' fees as authorized by statute;

B.     On the Third Cause of Action, an award of compensatory damages to the Estate, in an amount to be determined at trial or, in the alternative, disgorgement of Y.K.'s profits obtained as a result of her breaches of fiduciary duty in an amount to be determined at trial;

C.     On the Fourth Cause of Action, an order requiring the return of Plaintiffs' property or a judgment for their value, in an amount to be determined at trial, together with an award of punitive damages; and

D.     Such other and further relief as the Court deems right and proper.

Dated: New York, New York
       February 11, 2019

Respectfully Submitted,

KASOWITZ BENSON TORRES LLP

By: /s/ Thomas B. Kelly_____
      Mark P. Ressler
      (mressler@kasowitz.com)
      Kim Conroy
      (kconroy@kasowitz.com)
      Thomas B. Kelly
      (tkelly@kasowitz.com)
      Sondra D. Grigsby
      (sgrigsby@kasowitz.com)

1633 Broadway
New York, New York 10019
Tel:  (212) 506-1700

*Attorneys for Plaintiffs*

26