**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------ X
ANDREW WANG and SHOU-KUNG   :
WANG, individually and       :
derivatively on behalf of the   :
Chi-Chuan Wang Revocable     :
Trust,                  :
                            :
         Plaintiffs,     :
                            :     No. 18 Civ. 8948 (JFK)
  -against-           :     **OPINION & ORDER**
                            :
YIEN-KOO KING, KENNETH KING,   :
RAYMOND KING, LYNN KING,     :
JOSEPH SHIH-FAN KING, and DOES :
1-10,                 :
                            :
         Defendants.     :
------------------------------ X


APPEARANCES

FOR PLAINTIFFS ANDREW WANG AND SHOU-KUNG WANG
    Mark P. Ressler
    Kim Conroy
    Thomas B. Kelly
    KASOWITZ BENSON TORRES LLP

FOR DEFENDANTS YIEN-KOO KING, KENNETH KING, AND RAYMOND KING
    Sam P. Israel
    Timothy Savitsky
    SAM P. ISRAEL, P.C.

**JOHN F. KEENAN, United States District Judge:**

Before the Court is a motion by Defendants Yien-Koo King

("Y.K. King"), Kenneth King ("K. King"), and Raymond King ("R.

King") to dismiss the amended complaint filed by Plaintiffs

Andrew Wang ("A. Wang") and Shou-Kung Wang ("S.K. Wang"). For

the reasons set forth below, the Court grants Defendants' motion to dismiss.

## I.  Background

The Court takes the following relevant facts from the allegations in the amended complaint and, for the purposes of this motion, assumes they are true.

This action concerns a purported scheme to misappropriate artwork and assets belonging to S.K. Wang and the estate of the artist and collector Chi-Chuan Wang ("C.C. Wang"). (Am. Compl. ¶¶ 1, 16.)  Plaintiffs are A. Wang, the grandson of C.C. Wang, and S.K. Wang, the son of C.C. Wang. (Id. ¶¶ 9-10.)  Defendants are Y.K. King, the daughter of C.C. Wang; K. King, her husband; and R. King, Lynn King, and Joseph Shih-Fan King -- Y.K. King and K. King's children. (Id. ¶¶ 11-13.)

A. Wang and S.K. Wang are citizens of New York. (Id. ¶¶ 9-10.)  Y.K. King and K. King are citizens of the United States domiciled in China. (Id. ¶¶ 11-12.)  R. King is a citizen and resident of Oregon. (Id. ¶ 13.)  The amended complaint contains no jurisdictional facts relating to Y.K. King and K. King's other children, and they have not appeared in this action.

Between 1979 and 1997, S.K. Wang assisted C.C. Wang in managing his business and assets, which included a world-class collection of ancient Chinese art (the "Classical Collection").

2

(Id. ¶¶ 15-16.)  The Classical Collection included artworks that C.C. Wang owned.  It also, however, included artworks belonging to S.K. Wang and a non-party in this action, Hui Chen. (Id. ¶ 16.)

In 1997, Y.K. King objected to S.K. Wang acting as C.C. Wang's primary assistant. (Id. ¶ 15.)  As a result, C.C. Wang relieved S.K. Wang from the role and installed Y.K. King. (Id.) Y.K. King used this newfound access to C.C. Wang's assets and the Classical Collection to defraud and loot, with the help of her family, C.C. Wang's estate (the "Estate"). (Id. ¶ 33.) Specifically, Plaintiffs claim that Defendants perpetrated the following offenses, which the Court will outline.

1. The Transfer of Assets.  Between 1997 and 2003 when she managed C.C. Wang's affairs, Y.K. King, acting alone or in concert with her husband, orchestrated a series of fraudulent transactions in which a significant portion of C.C. Wang's financial assets were transferred to corporate entities she and her husband had formed. (Id. ¶¶ 19-21).  Some funds were then distributed from these entities to K. King directly. (Id. at ¶¶ 20-21.)  Y.K. King, K. King, and R. King are alleged to have used interstate wire transfers, telephone calls, and mailings to further their scheme to siphon off C.C. Wang's monetary assets and to transfer certain assets to their corporate entities. (Id. ¶¶ 23-24.)

2. The Purchase of C.C. Wang's Artwork.  Between March 31, 1998 and September 6, 2000, Y.K. King and K. King used the financial assets they fraudulently obtained from C.C. Wang to purchase art from him, specifically forty-five pieces of classical Chinese art, at artificially low prices. (Id. ¶ 22.)

3.  The Classical Collection Theft.  From 1997 until 2003, Y.K. King transferred artwork from the Classical Collection from a safe deposit box in C.C. Wang's apartment building to storage spaces at Day & Meyer, Murray & Young Corp. ("Day & Meyer"). (Id. ¶ 28.)  She then prohibited C.C. Wang from accessing those storage spaces. (Id. ¶¶ 27-28).

4.  The Northwich Bearer-Share Theft.  Y.K. King, in 2002, stole the bearer-share certificate to Northwich Investments, Ltd. ("Northwich"), a company holding certain assets belonging to C.C. Wang. (Id. ¶ 30.)  She had the share certificate ultimately re-issued in her name. (Id. ¶¶ 30-33).

5.  Will and Surrogate's Court Manipulation.  Y.K. King manipulated C.C. Wang to execute a will in June 2000 (the "2000 Will") that provided Y.K. King with an outsize portion of the Estate relative to her siblings. (Id. ¶ 25.)  In late 2002, C.C. Wang purportedly discovered Y.K. King's "misconduct in managing his affairs" and re-engaged S.K. Wang. (Id. ¶ 34.)  C.C. Wang then modified the 2000 Will to disinherit Y.K. King. (Id. ¶ 35.)  In 2003, he executed a new will (the "2003 Will") reinstating

4

the testamentary scheme he had employed in his wills prior to 2000 and disinheriting Y.K. King. (Id.)

After C.C. Wang passed away in July 2004, S.K. Wang and A. Wang submitted the 2003 Will to Surrogate's Court in New York County for probate, an action which Y.K. King immediately challenged. (Id. ¶ 38.) Y.K. King contended that the 2003 Will was invalid because C.C. Wang lacked capacity at the time of execution. (Id. ¶ 49.) In an effort to invalidate the 2003 Will, Y.K. King (1) made false misrepresentations to a medical expert, Dr. Goldstein, who testified in Surrogate's Court about C.C. Wang's mental state at the time of the execution of the 2003 Will, and (2) forged a document that purported to show a settlement between A. Wang and Defendants by which Defendants returned forty-six artworks to A. Wang in exchange for an agreement, on the part of the Estate, to allow Defendants to retain certain other paintings already in their possession. (Id. ¶ 57-58.) In May 2017, the Surrogate's Court invalidated the 2003 Will, removed A. Wang as executor of the Estate, and replaced him with Y.K. King. (Id. ¶ 58.)

6. The Sale of Restrained Artwork. Upon commencement of its proceedings, the Surrogate's Court issued a restraining order (the "Restraining Order"), which prohibited A. Wang, S.K. Wang, Y.K. King, and K. King from selling any artwork that "is property of the Estate" or was "formerly owned by" C.C. Wang.

(Id. ¶ 43.)   A. Wang and an attorney for the New York State
Office of the Public Administrator (the "Public Administrator")
had compiled a list of such artwork (the "Appel Inventory")
during the time they served as executors of the Estate. (Id. ¶
39.)   Defendants sold numerous artworks listed on the Appel
Inventory that were subject to the Restraining Order in private
sales in China, including six paintings collectively worth over
$30 million. (Id. ¶ 45.)   Plaintiffs, on December 8, 2018,
discovered that a seventh artwork from the Appel Inventory was
to be sold at an auction scheduled for late December 2018 in
Beijing. (Id. ¶ 46.)   They believe it sold for around $600,000.
(Id.)   They further believe Defendants funneled the funds
derived from the sales of the restrained artwork through R.K.
King's bank accounts. (Id. ¶ 48.)

        7. The Theft of S.K. Wang's Assets.   Defendants, in
addition to "stealing assets of the Estate," stole a number of
paintings personally owned by S.K. Wang. (Id. ¶ 59.)   Defendants
admitted in the Appel Inventory that they sold one of S.K.
Wang's paintings and were in possession of two. (Id. ¶¶ 61-62.)
Defendants attempted to sell a fourth painting at a private sale
in China, although the amended complaint does not state when
this sale occurred. (Id. ¶ 63.)

        8. The Fraudulent Bankruptcy.   Y.K. King and K. King
committed fraud on the bankruptcy court when, in 2007, they

declared bankruptcy and failed to disclose the full extent of their art holdings, failed to disclose their possession of the proceeds of illicit sales of restrained art, and failed to disclose their interests in their corporate entities. (Id. ¶ 64.) In 2012, based in part on Y.K. King and K. King's representations regarding the scope of their assets, the bankruptcy court issued an order of discharge to the Kings. (Id. ¶ 66.)

9. Fraud on the Court. Y.K. King committed fraud on the Court by filing an amended complaint in 2016 in a related RICO action, which contains false allegations against S.K. Wang and A. Wang. (Id. ¶ 67.) See First Am. Compl., King v. Wang, 14-cv-8948 (JFK) (S.D.N.Y. Sept. 27, 2016) (the "King Action"). Specifically, Y.K. King falsely alleged in her amended complaint that she did not discover the purported "straw men scheme" -- a scheme through which S.K. Wang and A. Wang allegedly re-sold artwork belonging to the Estate -- until 2013, when, in fact, she had discovered it in early November 2009 as she admitted in a 2010 affidavit. (Am. Compl. ¶ 68.)

Based on the aforementioned offenses, Plaintiffs in the amended complaint assert two claims premised on federal law: (1) violation of the Racketeer Influence and Corrupt Organizations Act ("RICO") and (2) conspiracy to commit a RICO violation. They also assert two state law claims for (1) breach

of fiduciary duty against Y.K. King and (2) conversion. Plaintiffs contend that, pursuant to 28 U.S.C. § 1331, the Court has federal-question jurisdiction over their claims arising under RICO. (Id. ¶ 7.) They also ask that, pursuant to 28 U.S.C. § 1367(a), the Court exercise supplemental jurisdiction over their state law claims. (Id.) In response to Plaintiffs' amended complaint, Defendants have filed the instant motion to dismiss.

## II. 12(b)(6) Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Matson v. Bd. of Educ., 631 F.3d 57, 63 (2d Cir. 2011). On a motion to dismiss, the Court must accept the factual allegations in the complaint as true and draw reasonable inferences in the plaintiff's favor. Tsirelman v. Daines, 794 F.3d 310, 313 (2d Cir. 2015). The Court will not credit, however, "'naked assertions' devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557).

On a motion to dismiss, "the Court limits consideration to: (1) the factual allegations in the complaint, which are accepted as true; (2) documents attached to the complaint as an exhibit or incorporated in it by reference; (3) matters of which judicial notice may be taken . . . ; and (4) documents upon whose terms and effect the complaint relies heavily, i.e., documents that are 'integral' to the complaint." Calcutti v. SBU, Inc., 273 F. Supp. 2d 488, 498 (S.D.N.Y. 2003) (citing Brass v. American Film Techs, 987 F.2d 142, 150 (2d Cir. 1993)).

### III. Discussion

Plaintiffs assert RICO claims against all Defendants pursuant to 18 U.S.C. § 1962 (substantive RICO claim) and § 1962(d) (RICO conspiracy claim). The Court will address these claims before deciding whether to exercise supplemental jurisdiction over Plaintiffs' state law claims.

#### A. Plaintiffs' Substantive RICO Claim

##### 1. Applicable Law

RICO confers a private right of action for treble damages to "[a]ny person injured in his business or property by reason of a violation" of the RICO statute. 18 U.S.C. § 1964(c); see also Bridge v. Phx. Bond & Indem. Co., 553 U.S. 639, 647 (2008). The RICO statute, in relevant part, makes it unlawful, "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign

9

commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Thus, to state a claim for a substantive RICO violation, a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001) (citing Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)). In addition, to establish standing under § 1962(c), a plaintiff must show that "she suffered an injury to her 'business or property,' [and] . . . that her injury was caused 'by reason of' the RICO violation -- a standard . . . equated to the familiar 'proximate cause' standard." D'Addario v. D'Addario, 901 F.3d 80, 96 (2d Cir. 2018) (quoting 18 U.S.C. § 1964(c)).

The RICO statute defines "racketeering activity" to "encompass dozens of state and federal offenses, known in RICO parlance as predicates." RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2096 (2016). "These predicates include any act 'indictable' under specified federal statutes, §§ 1961(1)(B)-(C), (E)-(G), as well as certain crimes 'chargeable' under state law, § 1961(1)(A), and any offense involving bankruptcy or securities fraud or drug-related activity that is 'punishable' under federal law, § 1961(1)(D)." Id. at 2096. A court will scrutinize closely RICO claims premised on the predicate acts of

10

mail and wire fraud in light of "the routine use of mail and wire communications in business operations," Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 489 (2d Cir. 2014) (citation omitted), and "the attendant ease with which a plaintiff may attempt to fashion a RICO claim based on allegations that may turn out to be insufficient to plausibly support one." Yarur Bascunan v. Yarur Elsaca, 338 F. Supp. 3d 301, 311 (S.D.N.Y. 2018).

Defendants do not challenge every element of Plaintiffs' RICO claims. Rather, they argue that certain injuries are time-barred, that other injuries were not proximately caused by the alleged predicate acts, and that Plaintiffs have failed to plead their claims with the required particularity pursuant to Rule 9(b). In addition, they argue that Plaintiffs' claims are barred by the Kings' discharge in bankruptcy court, the Full Faith and Credit Clause, collateral estoppel, and the Rooker-Feldman doctrine. The Court will start its analysis with whether Plaintiffs have alleged injury, and whether the RICO violations were the proximate cause of any injury.

### 2. Injury and Proximate Cause

The amended complaint asserts three injuries: (1) loss of art and assets by the Estate and S.K. Wang; (2) removal of A. Wang as preliminary executor of the Estate as a result of the jury decision in Surrogate Court rejecting the 2003 Will; and

(3) litigation expenses incurred by A. Wang and S.K. Wang in having to defend against a meritless RICO action in federal court. (Am. Compl. ¶¶ 78-79.) Defendants argue that Plaintiffs have failed to state a civil RICO claim premised on any of these injuries. The Court will address each injury in turn.

### i. Loss of Art and Assets

The first injury for which Plaintiffs seek recovery is "loss of art and assets" to the Estate and S.K. Wang. (Id. ¶ 78.) Defendants argue that any RICO claim based on this injury is time-barred. (Defs.' Mem. of Law in Supp. Mot. to Dismiss at 15-16 (Mar. 29, 2019), ECF No. 51 [hereinafter "Mem."].) For the reasons set forth below, the Court agrees.

"RICO claims are governed by a four-year statute of limitations which 'begins to run when the plaintiff discovers or should have discovered the RICO injury.'" King v. Wang, No. 14 CIV. 7694 (JFK), 2017 WL 2656451, at *7 (S.D.N.Y. June 20, 2017) (quoting In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 58 (2d Cir. 1998)). In other words, "[t]he limitations period begins to run when the plaintiff has 'actual or inquiry notice of the injury.'" Id. (quoting Merrill Lynch, 154 F.3d at 60). Accordingly, "[t]he first step in the statute of limitations analysis is to determine when the [parties] sustained the alleged injury for which they seek redress." Merrill Lynch, 154 F.3d at 59. The Court "then determine[s] when they discovered

12

or should have discovered the injury and begins the four-year statute of limitations period at that point." Id.

Defendants argue that, according to the amended complaint, the Estate and S.K. Wang lost their art and assets when Defendants allegedly pilfered paintings and financial assets from C.C. Wang and S.K. Wang sometime between 1997 and 2003 when Y.K. King managed C.C. Wang's affairs. (Mem. at 15.) Defendants further argue that Plaintiffs were on notice of this injury either by 2003, when C.C. Wang disinherited Y.K. King, or 2007, when A. Wang compiled the Appel Inventory, listing the paintings over which there is an ownership dispute. (Id. 15-16.) Thus, Plaintiffs' RICO injury premised on the loss of artwork accrued no later than 2007. (Id. at 16.)

Plaintiffs respond that they are seeking recovery for new injuries: the damage to the Estate that occurred when the Kings transported restrained artwork to China and then sold it there in 2018. (Pls.' Mem. of Law in Opp. to Defs.' Mot. to Dismiss at 11 (Mar. 29, 2019), ECF No. 52 [hereinafter "Opp."].) The Second Circuit subscribes to the rule of "separate accrual," which "begins the RICO limitations period afresh" with each new "independent" injury, even if the predicate acts causing that injury fall outside of the statute of limitation. Merrill Lynch, 154 F.3d at 59. Despite this rule, the Court holds that Plaintiffs cannot recover damages based on the alleged recently

discovered sales of artwork in China for the reasons that
follow.

Plaintiffs acknowledge in the amended complaint that the
loss of art and assets occurred between 1997 and 2003, when Y.K.
King allegedly stole works and monetary assets from C.C. Wang.
(Am. Compl. ¶¶ 22-24.) The amended complaint does indeed make
clear that Defendants were on notice of this theft by either
2003, when C.C. Wang grew "suspicious" of Y.K. King and
disinherited her from his will (id. ¶¶ 29, 35), or by 2007, when
A. Wang compiled the Appel Inventory, listing artwork
purportedly belonging to the Estate and S.K. Wang but over which
the Kings have claimed ownership (id. ¶ 39). Specifically, many
of the restrained artworks that were allegedly sold in China
within the four-year statute of limitations period are on that
list with accompanying descriptions such as "Kings claim Soon
Huat bought it from CC on 9/6/00" and "[b]elieved to be in
Kings' possession." (Am. Compl. Ex. A at 10.) Thus, Plaintiffs
were on notice that Defendants had taken the Estate's artwork by
2007. As this action was not filed until 2018, any injury
related to that loss is time-barred.

In addition, the predicate acts of transportation of stolen
artwork (an 18 U.S.C. § 2314 violation) and sale of stolen
artwork (an 18 U.S.C. § 2315 violation) do not save Plaintiffs'
untimely RICO claim based on the loss of Estate-owned artwork

and assets because these new predicate acts did not proximately cause the injury for which Plaintiffs are seeking relief. Had Defendants, and more specifically Y.K. King, not taken the artwork in the first place, there would be no injury here because there would be nothing to transport and sell in China. All these predicate acts did, therefore, was further an "injury that happened or could have happened independently" of them, which is insufficient to create a new and independent injury. Vicon Fiber Optics Corp. v. Scrivo, 201 F. Supp. 2d 216, 219 (S.D.N.Y. 2002). Plaintiffs "cannot use . . . independent, new predicate act[s] as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." Klehr v. A.O. Smith Corp., 521 U.S. 179, 190 (1997). Therefore, any injury derived from the loss of Estate- or S.K. Wang- owned art or assets is time-barred.

### ii. Removal of A. Wang as Preliminary Executor and Rejection of the 2003 Will

The second injury Plaintiffs claim Defendants' RICO violation caused is the invalidation of the 2003 Will and the removal of A. Wang as preliminary executor of the Estate. (Am. Compl. ¶ 78.) Plaintiffs contend that the predicate acts causing this injury were Defendants' (1) use of mail and wire fraud to procure false testimony from Dr. Goldstein (Opp. at 14; Am. Compl. ¶ 50); and (2) alteration of the settlement document in violation of 18 U.S.C. § 1512(c), which was submitted to the

Surrogate's Court, and used by the jury in reaching its final verdict. (Opp. at 14; Am. Compl. ¶¶ 52-58.) Plaintiffs' RICO claim premised on this injury fails for at least two reasons, which the Court will address in turn.

First, Plaintiffs have failed to allege how either Dr. Goldstein's false testimony or the fraudulent settlement document proximately caused the Surrogate's Court to invalidate the 2003 Will and remove A. Wang as preliminary executor. "Proximate cause requires 'some direct relation between the injury asserted and the injurious conduct alleged,' and 'a link that is too remote, purely contingent, or indirect is insufficient.'" Empire Merchants, LLC v. Reliable Churchill LLLP, 902 F.3d 132, 141 (2d Cir. 2018) (quoting Hemi Grp., LLC v. City of New York, N.Y., 599 U.S. 1, 17 (2010) (plurality opinion)). To determine whether there is a "direct relation," a court must evaluate "whether it would difficult to determine how much the tortious conduct injured the defendant, as compared to other factors." Id. Dr. Goldstein's testimony served as evidence of C.C. Wang's lack of capacity. The Surrogate's Court, however, invalidated the 2003 Will on three grounds: lack of capacity, fraud, and undue influence. (Israel Decl. Ex. A (Mar. 29, 2019), ECF No. 54-1.) Therefore, even if the jury had disregarded Dr. Goldstein's testimony and found that C.C. Wang did not lack capacity when he executed to the 2003 Will,

16

the jury still would have invalidated the will because they found it was procured through fraud and undue influence. Plaintiffs have, therefore, failed to allege that Dr. Goldstein's testimony proximately caused the jury verdict in the Surrogate's Court because they have not alleged "how much the tortious conduct" -- i.e., Dr. Goldstein's fraudulent testimony -- injured Plaintiffs "as compared to other factors" - i.e., the jury's additional findings that the 2003 Will was procured through fraud and undue influence. Empire Merchants, 902 F.3d at 141.

Regarding the fraudulent settlement document, there are no allegations in the amended complaint as to how the jury relied on this document in rendering its verdict. All the amended complaint states is, that the Defendants "have . . . used their forged settlement document to challenge the 2003 Will in the probate proceedings in the Surrogate's Court." (Am. Compl. ¶ 57.) Without more information, the allegations in the amended complaint that the fraudulent settlement document proximately caused the jury to find the 2003 Will invalid are merely conclusory. See e.g., Hollander v. Flash Dancers Topless Club, 173 F. App'x 15, 18-19 (2d Cir. 2006) (summary order) (affirming dismissal of a complaint containing "conclusory allegations" of "damages to financial interests" but which did "not specify how racketeering activities caused those damages.").

The amended complaint also alleges that the jury relied on Dr. Goldstein's testimony and the settlement document "among other things" in reaching its verdict. (Am. Compl. ¶ 58 ("In May 2017, based on, among other things, the false testimony of Dr. Goldstein and the forged settlement document, Defendants succeeded in invalidating the 2003 Will and removing Andrew as Preliminary Executor . . . .").) Plaintiffs, therefore, have conceded that the fraudulently procured evidence was not the sole basis for -- or even a "but-for" cause of -- the jury's verdict invalidating the 2003 Will, which then resulted in the removal of A. Wang as preliminary executor of the Estate. Hemi Grp., LLC v. City of New York, N.Y., 559 U.S. 1, 9 (2010) ("[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well.'" (quoting Holmes v. Sec. Inv'r Prot. Corp., 503 U.S. 258, 268 (1992))). Accordingly, Plaintiffs' probate-trial injury is too attenuated from the RICO violations for this Court to conclude that it was proximately caused by those violations.[1]

---

[1] The Court has received additional letter submissions from the parties addressing the ongoing proceedings in Surrogate's Court. (ECF Nos. 66, 67.) Defendants assert in their letter that the Surrogate's Court has recently agreed to decide whether a codicil executed eight days earlier than the rejected 2003 Will, and which contains the same material terms as the 2003 Will, should be probated. According to Defendants, if this newly-discovered codicil is probated, the amount of damages Plaintiffs can recover in this action would decrease. Thus, Plaintiffs' injury is premature. The Court need not decide this issue as it has dismissed Plaintiffs' RICO claims premised on injuries stemming from the probate trial on other grounds.

### iii. Legal Expenses in Relation to the 2016 RICO Litigation in Federal Court

Plaintiffs assert that they have incurred "significant and ongoing expense in defending against" the King Action, which, according to Plaintiffs, is "a meritless RICO action premised on knowingly false allegations." (Am. Compl. ¶ 79.) Plaintiffs contend that the predicate acts Defendants committed by filing their meritless RICO action were mail fraud (a violation of 18 U.S.C. § 1341) and wire fraud (a violation of 18 U.S.C. § 1343). (Id. ¶ 73.) Defendants argue that Plaintiffs cannot state a RICO claim based on the filing of the King Action because in Kim v. Kimm, the Second Circuit held that "allegations of frivolous, fraudulent, or baseless litigation activities -- without more -- cannot constitute a RICO predicate act." 884 F.3d 98, 104 (2d Cir. 2018).

Plaintiffs argue that they have alleged the "more" required by Kim because they have alleged a scheme by Defendants to defraud the Estate, which involved asset theft, misconduct in the 2009 bankruptcy proceeding, the sale of converted assets, and fraudulent litigation activities in probate court. (Opp. at 14-15.) Although Defendants have not responded to this argument, the Court holds that the filing of the RICO claim in the King Action cannot constitute mail fraud, 18 U.S.C. § 1341, or wire fraud, 18 U.S.C. § 1343.

First, because the Court has held that Plaintiffs have not
adequately alleged RICO claims premised on the sale of
restrained artwork or the proceedings in probate court,
Plaintiffs' RICO claim would be rooted solely in litigation-
related mail or wire fraud predicates -- specifically, the use
of mail and wires in filing legal documents in the King Action.
The Second Circuit has declared this kind of RICO claim
untenable. See Kim, 884 F.3d at 105 ("We conclude only that
where, as here, a plaintiff alleges that a defendant engaged in
a single frivolous, fraudulent, or baseless lawsuit, such
litigation activity alone cannot constitute a viable RICO
predicate act.")

Second, Plaintiffs have not alleged enough corrupt conduct
in connection with the King Action, such as bribery of witnesses
or parties, sufficient to hold that the filing of a fraudulent
complaint in of itself can constitute criminal mail or wire
fraud. See e.g., Snow Ingredients, Inc. v. SnoWizard, Inc., 833
F.3d 512, 525 (5th Cir. 2016) ("Only in Feld did the court allow
litigation activity to sustain a civil-RICO action, but in that
case the litigation activity included bribery of parties and
witnesses." (citing Feld Entm't Inc. v. Am. Soc. for the
Prevention of Cruelty to Animals, 873 F.Supp.2d 288, 318 (D.D.C.
2012))). Thus, Plaintiffs have failed to state a RICO claim

premised on Defendants' filing of their competing RICO complaint.

### 3. Defendants' Remaining Arguments

Having dismissed Plaintiffs' RICO claim for the reasons stated above, the Court declines to address Defendants' additional arguments that (1) Plaintiffs cannot recover against the Kings because of the bankruptcy court's discharge (Mem. at 20), and (2) Plaintiffs' RICO claim is barred by the Rooker-Feldman doctrine, the Full Faith and Credit Clause, and collateral estoppel (Mem. at 22).

### B. Conspiracy to Commit Civil RICO

Plaintiffs' amended complaint asserts a claim for conspiracy to violate RICO, in violation of 18 U.S.C. § 1962(d), which states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Plaintiffs' conspiracy claim is premised on the predicate acts and injuries described above. Because Plaintiffs have not adequately pleaded an actionable RICO claim based on those acts and injuries, their conspiracy claim also necessarily fails. See FindTheBest.com, Inc. v. Lumen View Tech. LLC, 20 F. Supp. 3d 451, 461 (S.D.N.Y. 2014) ("FTB's conspiracy claim is predicated on the wire fraud, mail fraud, and extortion theories described above. Because FTB has not adequately pled a RICO claim under those theories, FTB's

conspiracy claim fails as well."); see also Discon, Inc. v. NYNEX Corp., 93 F.3d 1055, 1064 (2d Cir.1996) ("Since we have held that the prior claims do not state a cause of action for substantive violations of RICO, the present claim does not set forth a conspiracy to commit such violations."), vacated on other grounds, 525 U.S. 128, 119 (1998).

### C. Supplemental State Law Claims

Having found that dismissal of Plaintiffs' RICO claims appropriate, the Court must now consider whether it should nonetheless exercise supplemental jurisdiction over Plaintiffs' remaining state law claims. A federal court ordinarily has supplemental jurisdiction to hear claims based on state law so long as they form "part of the same case or controversy under Article III of the United States Constitution" as the asserted federal claims. See 28 U.S.C. § 1367. A federal court may, however, decline to exercise supplemental jurisdiction in cases where it has "has dismissed all claims over which it has original jurisdiction." Id.; see also Castellano v. Bd. of Trustees of Police Officers' Variable Supplements Fund, 937 F.2d 752, 758 (2d Cir. 1991) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966))).

Because the Court is dismissing the amended complaint's only federal law claims -- and in the absence of diversity of citizenship -- the Court declines to exercise jurisdiction over Plaintiffs' remaining state law claims.

## IV. Leave to Amend

Rule 15 of the Federal Rules of Civil Procedure instructs courts to "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). Amendment is not warranted, however, "absent some indication as to what [a plaintiff] might add to [its] complaint in order to make it viable." Shemian v. Research In Motion Ltd., 570 F. App'x 32, 37 (2d Cir. 2014) (quoting Horoshko v. Citibank, N.A., 373 F.3d 248, 249 (2d Cir. 2004)). Accordingly, should Plaintiffs wish to amend their complaint, they must demonstrate (1) how they will cure the deficiencies in their claims by filing a proposed amended complaint and (2) that justice requires granting leave to amend. The motion for leave to amend shall be filed within 21 days of the date of this Order.

## V. Conclusion

For the foregoing reasons, the Court grants Defendants' motion to dismiss the amended complaint. Plaintiffs' claims are dismissed without prejudice. The Clerk of Court is respectfully requested to terminate the motion docketed at ECF No. 50.

**SO ORDERED.**

Dated:     New York, New York
           April 22 , 2019

_John F. Keenan_
           John F. Keenan
United States District Judge